Next case is number 25-1278, Harbor Business Compliance Corporation v. Firstbase.IO Inc. Mr. Schaffer. Good morning, Judge Hardiman. May it please the Court. Your Honors, I want to make clear at the outset, my client, Firstbase, concedes contractual liability and does not challenge the jury's verdict as to the liability or the damages on that. The problem, Your Honors, is that Harbor played fast and loose to rack up massive, unfounded trade secret damages without pinpointing with requisite particularity any protected trade secret that was misused by Firstbase outside of the party's contractual agreement. Analyzing particulars of the claimed trade secret, as this Court and all other circuits do, is fatal to Harbor's entire trade secrets case. Even now, Your Honors, Harbor cannot specify what exactly is the trade secret that was misappropriated. What was non-public that Firstbase took and used without Harbor's authorization? All right. You were a trial counsel. I was not. That's true. You were a trial counsel. Mr. Rodkey is here with us. And there was a lot that was forfeited at the trial, right? For example, I didn't see anywhere in the record that Firstbase challenged the protectability of the six trade secrets that were found by the jury, correct? I respectfully disagree, Judge Hardiman. So where in the record did they argue that these eight trade secrets or the six trade secrets that were found as proffered by Harbor were not protectable as trade secrets? Cite the record for that. It's orally in seeking judgment as a matter of law. After the close of Harbor's evidence, I have the record citation, Your Honor. I'll have it momentarily. It was very generic for all of these reasons. It didn't draw the judge's attention to that basis. You're talking about 266 in the appendix. You're right, Judge Hardiman. That is exactly it. Okay. That's exactly it. So that's where I'm pointing to. So, yeah, let's read it. Okay. Why don't you read it for me, for us? Because it was, you know, this was not an insubstantial trial. And Mr. Rodkey gets up and moves for judgment as a matter of law. I'm looking at appendix 266. I'm sorry, Your Honor. I'd look at 267 for what it's worth. You're right. 266 is where it begins. Well, right. So 266 at line 17, he begins. He says insufficient evidence and then two items. We're raising two items, right? Yes, Your Honor. He says we're raising it as to all of it. And the second basis is as to all trade secrets. The only, what needs to be shown for, there's no evidence, first off, Your Honor, there's no evidence of, direct evidence of, trade secret misappropriation. That's right, Your Honor. Where's the argument that these are not protectable trade secrets? Your Honor, I think it continues in this case. So it's line 12. Plaintiff failed to show substantial similarity as a matter of law, which was about substantial similarity to what is protected. That's the analysis. But by their own admission, they look for nothing more than breadcrumbs, which, as we saw from Dr. Polarity, were just passing references to things like states and entity names. That's a sufficiency of the evidence argument, not a protectability argument. Here's my respectful disagreement, Judge Hardiman. This is already in context as the district court understood it. And it's clear, both parties agree, that the district court understood for a space to be raising issues of protectability. You can take it from Harvard's footnote 1, Signing Appendix 14, where the district court, which found waiver as to other points, Judge Hardiman, did not find waiver on this. And the reason why is the context where at each stage. It's not a waiver. I mean, both sides are talking about waiver, and I don't quite understand that, because our jurisprudence has been quite clear for over a decade now about the distinction between waiver and forfeiture. Are you familiar with that distinction? Yes, Your Honor. And what is the distinction? Your Honors, waiver is when you do it by omission. Forfeiture, as I understand it, is when you essentially affirmatively relinquish. It's the exact opposite. I'm sorry, Your Honor. Exact opposite. Waiver is the intentional relinquishment of a known right, and forfeiture is failure to raise something through ignorance or inadvertence. I appreciate the clarification, Your Honor. And I would say that this Court's jurisprudence also teaches you, examine the forfeiture question in context of the trial and what the district court and what the other party would understand. And here you have it from the district court. It understood this to be going to the protectability of the trade secrets. And part of why, Judge Hardiman, is that every term prior to this, First Base had been pointing to the absence of protectability and particularity of the trade secrets. The other reason why is that the jurisprudence, including this Court's decision, When you say they had been previously pointing to that, where in the record had they been pointing to that? In discovery and summary judgment, which is something that Harbor points to as saying that then it didn't happen explicitly when there was this summary motion that was made orally. Is your argument that if the lawyers are talking about protectability during depositions and interrogatories, and then it comes up at summary judgment and summary judgment is denied, you're arguing that it need not be raised at the actual trial on the merits? Is that your argument? I don't mean to urge that categorical rule. I just mean that what is the... Then it's irrelevant that it was raised previously. The reason we have a trial is because that narrows the issues, and then the issues need to be presented to the Court and the jury. And I agree with that, Your Honor. I'm just saying that the surrounding context, which was known to the district court, would take account of that. But the other point that I would just submit to Your Honors, in terms of the law here, the question of protectability, or the question of particularity, is inextricably bound up in the misappropriation inquiry. And that's what this Court said in Mallet. That's what the Federal Circuit said in Olaplex. That's what the Seventh Circuit said in IDX. And if you disagree with that, Judge Hardiman, if you disagree with all of that, there's still the question of sufficiency of the evidence of misappropriation, which is undisputedly preserved, and I would submit that we win based upon that for reasons that are intertwined, to be sure, but that go to the misappropriation question. And if you disagreed with all of that, Judge Hardiman, all of it, we still have the motion for a new trial, which was not waived at the 50A stage, and stands because you don't have evidence that connects the dots as they need to be connected in a trade secret case between what's the protected trade secret that First Base misappropriated without Harbor's authorization. And those dots, I'm submitting to Your Honors, don't connect, and this would be the low watermark from all the jurisprudence for a trade secret case where liability stands, notwithstanding the absence of particularity, protectability, and something that was misappropriated by First Base and could be recognized as a trade secret. And I'm glad to go through the categories, Your Honors, of the claimed trade secrets to explain why that is so. And I just think if... All they needed to do was hit on one of them to sustain the verdict, right? I don't think that's true, Judge Hardiman, because the jury was discounting on the trade secrets award based upon two trade secrets that it found unprotected. Well, that's your argument about the double counting. I think you maybe have a compelling argument there. I mean, I'm going to ask your friend on the other side. I actually think it's more than double counting because the jury's verdict form had eight trade secrets. It found two, and then the amount that it awarded was calibrated to that. Now, you're right. It might go away if we find the remitter on the other side. A duplication, I would characterize it as that. What you're saying is that if there was only one protectable trade secret, that that was not enough to sustain the entire verdict. That's right, Judge Fischer. That is our submission. But I would also stand in the proposition that none of these were shown to be misappropriated or protected. But I'd stand on the misappropriation point, Judge Hardiman, if that's what the court is prepared to entertain. I'll start with the workflows. And these are never mentioned by the district court in analyzing sufficiency of the evidence post-trial. First Base itself created the workflows of the partnership, never used them outside, so there's no way, Judge Hardiman, that those could be what were misappropriated given that they, at least in key part, originated from First Base. And Harbor's not contesting that. The evidence of use consists of such things as offering a 50-state product. This was not a non-compete agreement that First Base was under. Anyone who wanted to compete in this industry would have had to operate in a 50-state basis, as Judge Fischer said, as First Base did. That's not evidence of misappropriation. And the API documentation, Your Honors, the district court never mentions that either. Harbor shared the API without any confidentiality agreement in place and on its website, and is still claiming that, without distinction, those are part of its claimed trade secret under the API. Are you talking about the beta testing phase? That's correct. All right, but right after the beta testing phase, an agreement was inked. Well, that's true, Your Honor. And that agreement had certain confidentiality provisions. It did, but during the intervening period, that was made available by Harbor to First Base without any strings, so it could have been publicized to the world, and this court held in Nova that when information has been released without any constraints, that is incompatible with claiming a trade secret. Even when there's a subsequent confidentiality agreement? That's true, Judge Hardiman, because during the intervening period... In Nova, there was a subsequent confidentiality agreement? There was not, but I don't think it materially alters the court's analysis, which is nothing stopped First Base from broadcasting that to the world without constraints. So that's incompatible with the party that is protecting and secreting its trade secrets. But more importantly, the only use of API that's in the record happened with Harbor's agreement under the same partnership agreement that it's recovering on for breach of contract. So that agreement forecloses the claim that there was misappropriation as to it. Entity manager, Your Honors, that's the map and the dashboard that Valerity never even... He never analyzed the Harbor code behind that. First Base never accessed the code behind it. You can find it in Appendix 865, 929, and 30, the proof of those propositions. And the claimed trade secret is the dashboard, particularly the public-facing features. So when you look for the evidence of misappropriation, Judge Hardiman, I don't think that the evidence that they used a U.S. map... Why is it the dashboard? It's the underlying technical code and the process here. It's not just the public interface. But, Judge Bevis, it absolutely includes the dashboard, and that's what Harbor was pointing to at trial. So if they had identified it with particularity... Okay, that's fine. So this doesn't go to predictability. This goes to misappropriation. I do believe that the two are intertwined, as we were discussing earlier. But, yes, it does go to misappropriation. And I would point the court to Appendix 880 and 81, where Dr. Valerity was pointing to the public features as the evidence of the use, and that's what the district court pointed to in Appendix 15, that which was public. It was not what was behind the dashboard. It was the dashboard, the visual features itself. Last, Your Honors, there's the jurisdictional database. And for that, the hand-picked example of the misappropriation was the fact that First Base was referencing California and New York. And I don't think, Your Honors, you want to write a published decision that says that referencing California and New York can be infringing, misappropriating a trade secret. And all the information in that database is publicized, the underlying information publicized by Harbor on the web, available publicly from the relevant states. What about their notes? I'm sorry? What about the notes column? The notes column, Judge Fischer, there was no correspondence with anything that First Base had. So this is not a case where Harbor said the tips and tricks that we had are tips and tricks that then appear with First Base. It was the very concept of having a spreadsheet that tracks this publicly available information intelligently when they cite to the First Base documents. Those First Base documents specify their source as the state websites. That's where First Base was getting the information in its spreadsheet. Nothing that corresponds with what Harbor had in the notes column that you're referencing, Judge Fischer. And so I just don't think that there is evidence of misappropriation that would possibly permit a verdict for Harbor. But at the very least, we think there should be a new trial because the underlying problem here is that there's no identification of the trade secrets with particularity, and then showing something that First Base did that corresponds with what's protected, and they did it outside the park. So how does that impact the verdict on the unfair competition? It falls... We think it falls away, Judge Fischer. The only thing that Harbor was pointing to that falls within the unfair competition instruction and was purportedly proved to the jury and the jury had instructions on was trade secrets. And at the very least, this court's precedents teach that if there's one potential basis for the unfair competition finding that was erroneous, as we think is true here, then the verdict can't stand. At a minimum, you'd have to remand for a new trial under the Avins case, under the Wilburn case. That's what those precedents teach, and Harbor has no answer to them. But I would also emphasize one other point, Judge Fischer, to make it easy for the court. There was one expert on liability, and that was Dr. Volarity, whom I want to talk about in a moment. Dr. Volarity was avowedly only a trade secret expert, and he claimed that there was misappropriation of the trade secrets. There is no other witness from Harbor who said here is a basis to hold first base liable. The damages expert, Dr. Urbanchak, was just a damages expert, and he simply assumed that there was liability for unfair competition because he got that from counsel. So the only way to sustain the count for unfair competition is by way of trade secrets, and at a bare minimum, we think this court would have to reverse and remand for a new trial if it finds the problems on the trade secret count that we think are jumping out from the record. If I may talk... When you say the problems under the trade secret count, you're talking about the insufficiency of the evidence. Yes, Your Honor. All right. But if we do find there's sufficiency of evidence, then we move to the issue of Urbanchak and how he calculated these damages. I got one more in the interim, if Your Honor will hear from me, which is Dr. Volarity's testimony, because Dr. Volarity was the key trade secret expert. Yeah, but I'm concerned about preservation of that as well. Can we talk about that, Your Honor? Yeah. Where in the record was there... Did your predecessor counsel object to Volarity's testimony because he did not disclose the basis of opinion under Rule 26 of the Federal Rules of Civil Procedure? And the reason I ask that is because the district court seemed to interpret that objection as being under the Federal Rules of Evidence, not a Rule 26 problem. Your Honor, I will agree with you that there was no explicit reference to Rule 26 or Rule 37. I absolutely agree with that, Judge Hartman. But as Your Honor sees with countless evidentiary objections that are happening in real time, counsel is not citing chapter and verse of the Federal Rules of Evidence when they say objection or objection hearsay or objection foundation. That's the verbiage of trial courts all the time. And let me point out what counsel did say at Appendix 200-201, if I may. I'm sorry, 200 and 201? 201. This is the initial objection. I'll take a little bit of liberty in kind of exerting, but starting on Appendix 200, quote, my objection to the specific exhibit and to any testimony as to who did what and when is that, as I understood Dr. Valerde's assignment, which will be pretty clear from the testimony because I asked him and was shut down when I probed the facts, is that he essentially took as an assumption that all of the trade secret information belonged to Harbor Compliance, defined the boundaries of the trade secret information and then looked at use from the assumption that all of the trade secret information belonged to Harbor Compliance. So what I think is out of bounds for testimony or any demonstrative is for him to opine on what the parties did. I think it's pretty clear from his representations from counsel that he can't come up here and talk about what he invented, what and what the significance was. And Mr. Rodkey continues to detail that specific objection. And I would also emphasize Judge Hardiman, he passed up the deposition excerpts. He passed those up to the court so the court could see what this court is saying about just how clear not only Dr. Valerde but his counsel were in saying this is beyond the scope of the case. But the judge said it went to impeachment. Yes, that was. And we also have the situation where Valerde issued a supplemental report that was quite extensive and there were all kinds of slack messages, some of which were pretty incriminating, that were produced in the interim between Valerde's deposition testimony and supplemental report, correct? Yes, well, I would disagree with Your Honor's characterization. I know that that's what a jury could take from him. I would agree with that much. Judge Hardiman, there was no indication from Dr. Valerde or his counsel that the scope of his engagement has changed, which is exactly what was said repeatedly by counsel at the deposition in the excerpts that were passed up to the district court. And then the district court, Your Honor, you've looked at the record, but he studied overnight the deposition excerpts relative to a video where Dr. Valerde was going to say this was all built by Harber and then first base came in and just put its stickers on it. So that's the narrative he's telling from the video. And on appendix 213, there's the definitive overruling of the objections as stated. And then after that, Judge Hardiman, Harber came in with the slides that Dr. Valerde testified to. And if Your Honor wants to look at one illustrative slide, I think you can find it at 1371, which is a slide, what Harber took from, what first base took from Harber compliance. Exactly what he had disavowed at deposition. Exactly what counsel Harber said was beyond the scope of his engagement. And then the district court looks at those slides, and Mr. Rodkey renews his objection to any such testimony about the slides. That was dozens of pages of Dr. Valerde's testimony. And that happens at appendix 22324. And for the record, I think it was already clear, but in 223, he said, this is Mr. Rodkey, quote, I have an objection for the record, based largely on the transcripts that I provided, but I assume Your Honor's ruling is consistent with that. I just wanted to state that I preserved it for the record. The court, yeah, and it is preserved for the record. And then the court adds, and I did rule on that earlier. So it's the same ruling. Dr. Valerde is going to be able to testify here without regard for his clear disavowals and the representations from counsel as to the limited scope of his engagement, which warded off the questions that were being asked of him about all these critical facts that were then featured in his testimony. And then, I know Your Honors have seen the record, but if you look at appendix 855-91, on direct, Dr. Valerde at great length is going through the slides, going through the video, and saying, Harbor made it, Burbanks took it. What in Valerde's testimony was inconsistent with his supplemental report? Well, I think all of it was inconsistent. I guess I'm asking, was the problem the supplemental report or the problem the testimony? Because if his testimony was essentially a regurgitation of his supplemental report, then we need to focus on the legitimacy of the supplemental report. Here's what I'd say, Judge Hartman. We had asked Dr. Valerde, are you opining about these facts and whose trade secrets these were and whether First Base took them from Harbor and whether First Base could have developed them independently? And he said, no. All I know is what I'm getting from counsel. Those are my only opinions. But you're talking about his deposition. I am talking about his deposition testimony. But the deposition was before the supplemental report. Well, he was deposed after the supplemental report. I think that's wrong chronologically.  Yes. Okay. Yes, Judge Hartman. It was after. But also, remember, it spoke to the scope of his retention. And as long as the scope of his retention had not changed as far as we understood it, there was no—not only was there no reason, but there was no ability to ask him questions about these matters, which is exactly what he went on to spring lavishly at the trial. And so my respectful submission— So it's an unfair surprise objection. It's an unfair surprise, Your Honors, and it's an end run around Rules 26 and 37. I mean, I do think that if this goes, then there are no— you have every incentive for a party in Harber's position to play the game of surprise and ambush. Okay. And it was hugely pivotal to the case. He's the only liability expert. This is a purportedly technical matter in terms of trade secrets. The judge observed that the jury seemed to be struggling with it. And there's Dr. Valerde vouching for Harber's entire case from soup to nuts. And especially if Your Honors perceive problems with perspective particularity and misappropriation and duplication of damages, I think this is another reason why— So didn't you have an expert to rebut Dr. Valerde? Your Honor, we didn't have an expert who was on point as to the trade secrets. But keep in mind, we didn't understand that Dr. Valerde was going to be an expert on the things that he purported to be expert about. Well, the harmful testimony was elicited by your trial counsel. Judge Bevis, I know that that's the other side of submissions, Your Honors. I want to correct it. Please, before you accept that account, look at pages 855 to 91 of the record. That's where Dr. Valerde said everything that came out on cost, maybe a little less pithily, but the substance was all there. Let me read Appendix 863. This is part of the direct. So this already shows that. He's narrating the slides now. With the help of the building blocks that Harbor Compliance provided in trade secrets, First Base was able to expand to all 50 states. They learned. First Base learned about Registers Agents, Inc., in California from Harbor Compliance. First Base was now able to tap into as a result of the teachings of Harbor Compliance. Appendix 864, more of the same, that they are now learning its importance to capture for all of the states, referring to First Base. Appendix 882, First Base did not have an agent dashboard before Harbor. So he's doing all the same things substantively that First Base then explored on Cross, and I have to say, in fairness to my predecessors here, they were told by the judge their only recourse in the face of this unfair surprise in Stark violation of Rules 26 and 37 was on cross-examination, Judge Bevis. So if we hadn't gone there on Cross, we wouldn't have been availing ourselves of the only recourse that the district court had pointed out. So I think it is unfair and unconvincing for Harbor to say that we somehow were victimizing ourselves by trying to get Dr. Valerde to, you know, go where he had not gone in deposition but had gone in his direct testimony at trial. But you concede that Rule 26, Rule 37 weren't adverted to in the objection. They were not explicitly referenced, but I really want to emphasize this one point, Judge Hardiman. I don't know of this court or any circuit saying in order to preserve an evidentiary objection, the chapter and verse need to be cited, and the district court. Well, I agree. I mean, the objection is typically a hearsay, unfair surprise, et cetera, but it would be pretty peculiar to cite a rule of civil procedure as a trial objection rather than a rule of evidence or a principle of evidence, right? That goes more to the way the litigation plays out entirely if you're dealing with Rule 26 and Rule 37. I only play a trial lawyer on TV with the help of my colleagues, so I'll stick to what I know best. But I want to say this. When I have seen trials, I have absolutely seen routine reference to experts needing to be held to the bounds of their expert report and their depositions because of these principles, which are then not specifically referred to. And I think the reason we didn't go further in these colloquies is the district court was so certain that he was going to permit it because he just did not think there was any sort of a problem with the unfair surprise so long as there was still room for impeachment and cross. All right. My last point, Your Honors, would just be the duplication. I think it's clear from the record. I think Your Honors – We'll get into that on rebuttal. Okay. Sounds good. Thank you, Your Honors. Thank you.  Mr. Feranda-Dedrick. May I introduce the panel, Matthew Feranda-Dedrick from the law firm of Royer Cooper, Cohen-Gronfeld for Appley Harbor Business Compliance Corporation. Your Honors, I wanted to start out by just acknowledging something that Judge Hardiman raised with my adversary, and that is that we did get the reference wrong in our briefing as it pertained to forfeiture and waiver, obviously, and that was my fault. I take accountability for that. Actually, some bright people on my team reminded me of that a couple of days before the argument. But the standard is what's important here, and Your Honors are right that forfeiture, first base has forfeited almost every single argument. What they're essentially saying, Your Honors, what they're essentially having you do is to retry the case for errors that were never presented to the district court to rule on. Okay. Now, the double-counting argument was preserved here. The post-trial motion is very clear on that at page 50, and you've got a serious double-counting problem here. When you do the math, they asked for the exhibits back. They took the $14,757,399. They multiplied it by six-eighths, and then they miswrote a nine as a four, and that's exactly how you get this very precise number for the infringement damages. So isn't that a classic case of double-counting? The only theory here is disgorgement. So you can't recover disgorgement on both theories, the secrets and the competition. That is actually wrong on two points, Judge Bibas, respectfully. Number one, although the number itself is very consistent or looks very consistent with a number that was on Mr. Urbancheck's slides, that is not the same thing as saying that that's how the jury arrived at that number. After they called for that to be brought to them in deliberations? Yes, and I can explain why, but doing so, Your Honor, would really be to invite the second thing, which I'm going to talk about, which is speculation. This court, in an en banc decision in Chewy from 1979, C-H-U-Y, is very clear that the only way that you can get into the minds of the jury is if we're talking about something like a formula that they have to input into and then get things back out of. You are otherwise not allowed, as any court, to sit as the 13th jury. Did Chewy involve mathematical calculation? Well, so Chewy did not involve this scenario. But you just cited it for a broad proposition. It might not apply when you're doing a simple mathematical calculation. Well, Your Honor, this is not a simple mathematical calculation. Six eighths is pretty unusual. I think we all went to law school for a reason, but we can do six eighths. Your Honor, I would submit and I would agree that it is very peculiar and coincidental. Okay, so you agree that if it were the case that the jury wrote down amount of damages from urban shock, 1477, times six eighths. It's written on the back of the verdict form or something. If that's what they did, we would then reverse because you can't disgorge both, and disgorgement's the only theory. Not yet, because that second assumption you're making is also not accurate. Disgorgement was not the only theory presented to the jury. We very specifically presented a claim of unfair competition to the jury that was based on several things. But the measure of damages.  Or unfair competition. Urbanchik, I'd love to be, you know, shown the evidence that I'm mistaken here, but Urbanchik said that it was unjust enrichment, that the jury was invited to award your client damages for the money that First Base made as a result of their trade secrets violation and their unfair competition, correct? Well, there's a direct quote there, Your Honor, that we actually reference. It's footnote nine, supplemental appendix 582. And there, Mr. Urbanchik is very clear. He's not saying that that's the totality of damages. He's opining as to defendant's profits. That's what he's doing there, okay? What's important is that the jury heard other evidence besides defendant's profits. Other injury. What was the other injury? What was it? The other injury was that Harbor Compliance could have gone out and actually made additional revenue with another company. They were subject to an exclusive relationship with First Base, right? Where were the specific damages calculations presented to them about that lost opportunity? Absolutely. So that was presented in a couple places, Judge Bibas. One, First Base's own documentary evidence. That was the $2.15 million per month that First Base was promising Harbor Compliance. And these numbers don't bear any relationship to $2.15 million a month? Which numbers, Your Honor? The numbers that were returned. Yes. They're not some multiple of $2.15 million. But they were within a range, Your Honor. He had the $14 million number. I can't find it right now, but I remember reading it in one of the exhibits. It's right on our ban checks exhibit. It is also on our ban checks exhibit, though, Your Honor, is the term of the partnership agreement, which is 24 months. All right. $2.15 million. You don't get anywhere near this. Well, you get to $38 million. You could have gotten to 38, right? Correct, as a total damage calculation. We would have to be ignoring what's right in front of our face not to conclude that the $14 million on the verdict form that the jury found is taken directly from or Can you point us to that slide? I want to look at it. Sure. It's Supplemental Appendix 582, Your Honor. This would be a hard case if they returned some round number like $20 million. But they didn't. They returned an eight-figure number down to the dollar tracking or ban check slide. Actually, I respectfully disagree with that, Your Honor. They did not do that. Hold on a minute. I'm having trouble finding it. You said Supplemental Appendix 582. I'm at that. I believe it should be the correct site. That looks like transcript. Oh, sorry. Yes, that's where he's – I thought that's what you're on. I'm going to look at the chart because the picture is worth a thousand words. And when I was going through the record, I saw the chart, and I thought it was obvious where the jury got that number from because I saw it right on your damages experts chart. And I don't have that site for you, but I will get it, Your Honor. But the point here, Your Honor, is more that the damage figure, right, we are all speculating right now. We're speculating that they inferred the numbers. I'm not speculating what was on Urbanak's chart. Well, but we're – And you put an expert on the stand, and you put a nice, shiny chart up there for the jury to look at, and the jury picked that exact number for that award. They did. But, Your Honor, they did not – And you're trying to argue that it's something different. We're speculating where it came from. You put no number up on that chart on unrealized revenue. Well, actually, we did, Your Honor, not on that chart, but in closing argument, we had a demonstrative exhibit that specifically called out that $2.15 million number. I argue it in closing. I ask for it as a damaging – in closing, it's there on the record. Secondly – 2.15 times how many months did you ask for? There were 18 months left, and that was established. Okay, so what relationship does any of these bear to 2.15 times 18? That's about $40 million. Right. Well, I can explain, Your Honor. Okay. Two answers there. First, the case law is clear that as a reviewing court, this court just needs to determine whether or not the damage award is supported in the record. That is the inquiry here. But $14 million is supported. And the range. What we're getting at is that when a damage expert comes into court and says, in my expert opinion, they have been damaged $14 million. You don't get to multiply it by two. Right. Or you don't get to multiply it by two less a quarter. But that is not what Mr. Urbanchuck said. Mr. Urbanchuck provided a theory of damage recovery that the jury ultimately did not go with for unfair competition. That is what we are saying. Okay. There's a specific additional harm here that needs to be remedied, and there was evidence in the record to provide the jury with a way to get to that harm. We can speculate all we want, and we can say it's six days or, you know, we must have assumed they did this. The other possible, I would submit, reasonable speculation here would be to say, because the jury has to be unanimous, and we're back in the jury room, and some people want to award $38 million, and some people want to award a lot less than that, that they come up with a compromise verdict. It happens all the time. First base did not ask for specific interrogatories on the verdict. First base did not ask for the jury to be polled or questioned. The district court, look, the district court said, look, it has to be crystal clear. And that's a fair standard. It has to be crystal clear how they ran into it. But the district court then said, well, they didn't ask for interrogatories. I'm not aware, and you didn't cite any case law that says you must have the interrogatories. Now, usually it won't be crystal clear without them. But the question is, was it crystal clear here how they came up with their number such that we can tell it's a double recovery? And you're resisting, and I think your argument would have a lot more power if they picked a round number, if they picked a number in between the disgorgement amount and the lost business possibilities amount to $40 million, if they came up with something else. But when they come up to the dollar with the $14,757 and change figure, and they come up with an $11 million number that's just, if you write a 9 and then it looks like a 4, it winds up being 6 8's. We almost have to speculate to come up with a compromise verdict that magically lands on the same number. Okay, so you've got the chart. You've got the citation for the chart. Pull that up. Appendix 1415. 1415. A joint or supplemental? Joint. Okay. Or opening, yes. 1415, you said? Yes, Your Honor. All right. That's one. That's a three. Sticking to that point. Yes, Your Honor. If Mr. Schaffer, well, Mr. Schaffer didn't address that. But if there was double counting here, if there was double counting here, I'm not asking you to agree with that. But if there was double counting, what's the number that should be remitted? Should it be the $14 million and change or the $11 million and change? Well, I would argue. I know you don't want to answer that question. Well, no, I actually have two answers for you. Okay. First of all, even if there was double counting, nothing should be remitted. I know it's kind of curious, but I'll explain. And that is because the trial court makes very clear, and this is super important. They make very clear that the totality that Herbert Compliance was injured was the full $25 million. And that is why they don't award exemplary damages. That's within trial court's discretion. And that is why he doesn't award attorney's fees primarily. So if anything is going to change, obviously those two things have to come back in play. And we would argue that functionally there would be no remittance at all. Including in my question was the assumption that that was incorrect.  Okay. Second of all, your Honor, quite clearly the only thing that was argued before the district court was that the $11 million should be remitted. Not the $14 million. They've now flip-flopped on that. Okay. All right. And does it need to be a conditional remittitor? In other words, your Honor, I'm sorry? That there's more work for the district judge to do rather than just basically say strike this $11 million and keep the verdict the same?  Absolutely. If your Honors would reach that. Then what does that look like? So what that would look like, your Honor, is the judge would have to go ahead and post trial motions and use his discretion again. Just like he did the first time around. And he'd have to pass on exemplary damages. And he'd have to pass on attorney's fees. Both of those, the judge declined to award in large part because he found $25 million was the total amount of Harbor Compliances losses. And I didn't really focus on the attorney's fees aspect of this. So tell us more about that. Certainly. So under the DTSA, those attorney's fees are not mandatory, but they are optional in the discretion of the district court. You look to certain factors. And one of the factors the district court stressed was he referenced back to his discussion on exemplary damages where he said, listen, you know, harbor's already been awarded $25 million. That's the totality. I find this. I sat here trial and I listened to the same evidence to your sense. It was the court's view on attorney's fees. Was it? It would be piling on based. Absolutely. And if and if the $11 million is taken out, it might not feel like it's piling. Absolutely, your Honor. And that's important, too, also to the double counting issue. If I could just go back to that for one second. I think that we need to give appropriate deference to the trial court judge. Trial court judge sat there and heard all of this evidence. And I know we're going back and forth and saying in our mind on a cold record what it might mean or say. The trial court judge ruled on that issue, had all of the witnesses. Your Honor said it was a very substantial case and it was over 10 witnesses, hundreds of exhibits, 10 days of trial. And his honor found that $25 million was fair compensation for harbor compliance on those two claims. It certainly could have been fair in the abstract. But as Judge Bibas pointed out, this was not one of these compromise verdict round numbers. The numbers here were very precise and they tracked very closely to what you were offering in terms of your damages. Acknowledged and admitted, your Honor. But we don't know whether it was a compromise verdict or not. That's the whole point. That's why we can't speculate. Juries might not give round numbers in compromise verdicts. We can't say because it's a round number or not it is or is not a compromise verdict. That would be inviting us into the jury room. We weren't there. I'd like to go to one other point. We've spent a lot of time now on the numbers. But on the Rule 50A motion on the sufficiency of the evidence. Yes, your Honor. And the point was made extensively that there was forfeiture on the protectable trade secrets question. Yes, your Honor. But wasn't the entire tenor on the motion that there was a misappropriation because there was no protectable trade secret. Wasn't that really the entire tenor of their argument? Your Honor, it was not. And the proof of that is in my response. So counsel cited to you to the argument. I would cite your Honor to my response to that argument. My response addresses the argument directly. And it focuses on the jury instruction on circumstantial evidence. Your argument when? At the Rule 50A stage. So Mr. Rodkey stood up and argued this motion. And his adversary heard the argument and met it. And you should be considering that when you're talking about what the tenor of the argument was. They weren't talking anything about protectability. That issue was long dead and gone. They abandoned it during discovery. They never refiled their motion for a more definite statement of the trade secret. It was gone. It was never an issue at trial. It was never talk about a trial. And I'll do you one better. They had a trade secret liability expert also, this man named Mr. Waldbusser. His reports and testimony in the record are voluminous. And in his reports, he testifies to things such as he has charts, little cool charts. He does check boxes when factors are established and red Xs when they're not. And he goes through each of the trade secret factors, including protectability, and talks about it. Now, if it was really so unclear about what this issue was or what the trade secrets were, they wouldn't have been able to do this. They wouldn't have been able to have their expert actually go through and do this. So this argument is completely manufactured for appeal and forfeit. I know I'm at my time. If Your Honor said further questions. I had another question about something that we dealt with with Mr. Schaefer, but it's escaping me now. Was it on Dr. Velarde? Yes. Thank you. Rule 26, Rule 37, was that preserved? Tell me why it wasn't preserved and tell us why, if it was preserved, it's unpersuasive. Well, so it was not preserved. This is their whole argument. But this argument in particular presents issues as error that were never presented to the trial court. The only thing presented to the trial court in that moment was we believe that Dr. Velarde is going to testify based on assumptions, not facts. That's what was presented to the trial court. The trial court said, I understand that he's going to testify based on assumptions. If he testifies based on facts, of course you can cross-examine him on that or move to strike it or do whatever you would like to do. That was the ruling. The judge did not rule on a Rule 26 or Rule 37 motion. That is very clear from the record. Why does it matter or sort of what was to come from that, Your Honor? So Dr. Velarde, as Your Honor rightly pointed out, in supplemental reports, put all over the place, all over the place, that he thought it was harbor compliances information. Now he does that two ways. One, he goes and refers to some of the same documents, the Slack messages and everything you all are referring to. But then also he cites the partnership agreement. The partnership agreement allowed use. It didn't allow improper use. Everyone knew that that was an issue in the case, that the partnership agreement allowed use but not improper use. And that's what Dr. Velarde was testifying to. Now, also, when Dr. Velarde goes through and is asked most of these questions, many of them are on cross-examination. They literally do like a kamikaze mission where they elicit 99 percent of what they say is objectionable on cross. Well, but their argument is that the judge had already ruled, and the judge said that's a matter for cross-examination. So what are they supposed to do then?  So what they should have done if their objection had any merit, Your Honor, is they should have immediately stood on their feet during direct examination and moved to strike. That's exactly what they should have done. And then they would have had— Objection, moved to strike, facts, testifying to facts, not in evidence, things like that. Yes, and then they would have had an appealable issue. Right then they would have had an appealable issue because the judge set the boundaries. This is their argument. The judge set the boundaries, and we went outside of the boundaries. That's their argument. They should have moved to strike, and they didn't. Or they should have asked for a curative instruction, and they didn't. And if the judge had ruled against them— Or they could have said he's testifying outside the scope of his— Right, then they would have had an appealable issue. But they didn't do that, Your Honor. Unless there's anything further from the panel? I think there's a note from your friend. Which one? This one? Yeah. I got it. Thank you. All right. Thank you, Mr. Fran de Dietrich. We'll hear rebuttal from Mr. Schaefer. Thank you, Your Honors. I'll start with the duplication issue. And Judge Hardiman, for your benefit, I think Mr. Fran de Dietrich cited you to a different chart than I would do. If you look at page 27 of our reply brief, you will see a visual depiction of what appears in Appendix 1405 and 1414 for Rubanchek and Judge Bevis. The numbers are right there to a penny. The number that was listed for the trade— That's so much easier to look at because it's this way instead of— Yes. Yes, Your Honor. You don't have to bend for it. But the numbers are—and I'm not a mathematician either—but $14,757,399. Sorry. And that is exactly what appears under the heading of the award for the unfair competition per his exact calculation and for the trade secret claim, six-eighths of it. There's just no denying that. And that number is derived based on first basis earnings, prior earnings, and projected earnings. That's exactly right, Judge Hardiman. On the same two products that are accused, it's all of those profits going forward. That's the basis. That's what he was calculating off of. And when Mr. Ferrandi-Dietrich posits other bases, they're not—there's no path to get to those damages. When he talks about other partnerships that could have been pursued, remember, Your Honors, they recovered under their contract with first base. They can't have cake and eat it, too. They're recovering per the terms of the partnership agreement there. They can't posit a world where there was no partnership agreement. It never would have worked. But more importantly, Your Honors, when you combine math with the uniform jurisprudence on the rule against duplication and how it's enforced, I look for a case that goes harbor's way on this, Your Honors. Can't find it. I mean, this court, the Federal Circuit, the Sixth Circuit, every court that looks at this says, of course we can't have duplication. The jury was told you can't have duplication. But theoretically, this unfair competition claim chart from Urbanchik could have measured damages based on harbor's lost opportunities. And that might have been $10 million or $20 million or some other number. But the fact remains that it says right on their defendant's profits. That's right, Your Honor. And that's consistent with the testimony on this. That's the pathway he urged to the jury. So it all aligns that way. And I would just note, if there had been some other pathway that was offered, we would have potentially been objecting based upon that, arguing based upon that. They took the pathway they did, and the jury gave it to him twice. But he said he asked for it in his closing argument. Well, Judge Fischer, that's not evidence. I understand that. And it doesn't deny that. But wasn't there enough in the overall case to justify that request? I don't see how, Judge Fischer. Well, he didn't have the chart and the number. But, you know, he's saying they're entitled to a sum as high as $38 million. Keep in mind that the jury asked for these slides and then returned the verdict per these slides, per this pathway. And there's no other coherent, logical pathway to get to damages that were for disgorgement of first-basis projected profits on the same two products. That happened twice. Just can't happen, Your Honor. So there's work for this court to do, we respectfully submit. Mr. Ferrandi-Dietrich says that's more work on remand. My submission to Your Honors is do more work here, including as to Dr. Valerdi's testimony, if I may speak to that. Mr. Ferrandi-Dietrich was asked a question by you, Judge Hardiman, that he's never been asked. How do you reconcile what Dr. Valerdi did on the witness stand with what he said in his deposition testimony? And when Your Honors looked at those deposition experts, what was the consistent position of Dr. Valerdi and his counsel, he was disavowing the exact opinions that he offered at trial. It's not unusual for experts to testify on the stand differently than they do in their depositions, and that's what cross-examination is for. You make them look like they're lying or dissembling or changing their mind or unreliable. That's endemic to every trial that involves experts. I see plenty of records, Your Honors. I think what is unusual is the way that there was the disavowal of the deposition, and I would point Your Honors to Appendix 748, 749, Appendix 752, Appendix 759. The claim there was that Dr. Valerdi should not answer questions about what party did what when and who had invented the trade secrets. And the reason why, according to Ms. Lapsko, representing Dr. Valerdi for Harbor, he was not engaged to opine on, again, who did what or owned what. Again, 759, he's not engaged to opine on first base's technical competency. You were not going to allow him to answer those questions when they were being posed to him, Judge Hardiman. And then on the witness stand, this becomes the heart of his testimony and the heart of Harbor's case. When asked by your colleague. No, respectfully, no. What happened earlier on the direct about the slides and the video that the district court had specifically studied and said, I'm going to allow Dr. Valerdi to testify about those, about misappropriation by first base of what Harbor had created. And he did that after looking at the deposition excerpts that had been passed up to him. And contrary to what Mr. Fran de Dietrich says, I know you've looked at the record, Judge Hardiman. The district court judge never said you can renew your objection if he's doing what you've warned me he's going to do and what I've seen him doing on the slides. He never said you can move to strike. He said your objection is overruled. It's preserved. And when it came back in connection with the slides, he said, you're right. I ruled on that earlier. The only recourse we had is the cross-examination excerpts that your honor has been pointed to, which is where we tried to do what we could at trial to get after this testimony for the first time. That, your honors, is a problem. And it's a problem that warrants reversal we submit and remand for a new trial, which they're going to be further proceedings anyhow if your honors agree on the duplication point. And the last point, Judge Hardiman, is I think the problems go all the way down to trade secrets. You've seen how Harbor is trying to spin its way out of duplication of the damages award. My submission to your honors is that they did that when it came to defining the trade secrets and proving that there was misappropriation of the trade secrets. The dots never connected. They needed to connect in order to get to a verdict that was consistent with the weight of the evidence and would withstand a motion for a new trial and would withstand Rule 58. I agree with opposing counsel's argument that trial counsel essentially abandoned the protectability of trade secrets earlier in the case. Judge Fischer, I read the very limited portion of the record where there was the oral 50-A motion the same way that your honor does, where counsel was saying, look at the breadcrumbs you were pointing to. The breadcrumbs you were pointing to are not evidence of any kind of misappropriation. And what is obviously bound up in that is because there's nothing protected that we could have been taking if we're just launching a 50-state product, using the U.S. map, referencing California and New York. That's what counsel was saying, and it hearkened back to what counsel had been saying in earlier stages of the case. And as your honors know, there's limited time at trial. You've got a jury that's waiting on you. You've got a trial judge who wanted to keep things going. We were brief in our 50-A motion, but we certainly preserved the misappropriation argument, which under the law and under the facts and under the context, goes to protectability too, and that's how the district court understood it. I think that that tells your honors that there's work to do under 50-A, but if you disagreed with that, I think there's still a basis for a new trial all across the board here, except for the breach of contract. We'll take our lumps on that. That's my submission to your honors. Thank you very much, Mr. Schaffer. Thank you, Mr. Friend-Dedrick.